**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO,
EASTERN DIVISION**

| | | |
|---|---|---|
| **CAMERON PADGETT,** | : | |
| | : | **Case No. 2:17-cv-00919-ALM-KAJ** |
| **Plaintiff,** | : | |
| | : | **JUDGE MARBLEY** |
| **v.** | : | |
| | : | **MAGISTRATE JUDGE JOLSON** |
| **MICHAEL V. DRAKE, in his personal** | : | |
| **and official capacities as president** | : | **JURY DEMAND ENDORSED HEREON** |
| **of The Ohio State University,** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

## DEFENDANTS' ANSWER TO PLAINTIFF CAMERON PADGETT'S FIRST AMENDED VERIFIED COMPLAINT

Defendants Michael V. Drake ("President Drake") and Whitney Rule ("Ms. Rule"), for their answer and affirmative defenses to Plaintiff Cameron Padgett's First Amended Verified Complaint ("complaint"), hereby state, allege, and aver as follows.

## PREFATORY  STATEMENT

### The Ohio State University

The Ohio State University (the "University," and/or "Ohio State") is a public, land grant, research, urban, community-engaged institution.  Its core goals include teaching and learning, research and innovation, outreach and engagement, and resource stewardship, which includes the goal to be an affordable public university, recognized for financial sustainability, unparalleled management of human and physical resources, and operational efficiency and effectiveness. Nearly 60,000 students are enrolled at the Columbus campus alone, with more than 200 undergraduate majors, 157 master's degree programs, 121 doctoral degree programs, seven professional degree programs, and more than 12,000 courses offered each year.  Approximately

45,000 persons are employed by the University, including nearly 13,000 student employees. Some 14,000 students live on campus. On any given day during the academic year, it is estimated that 120,000 people come and go, carrying out the work of the University, and its educational mission. A vast array of work is carried on at the University every day, from classrooms, to research laboratories, to day care centers and libraries, and medical centers that include a 900-bed teaching hospital and 300-bed comprehensive cancer center, whose treatment efforts are essential to thousands of patients and their families each year. The University manages a complicated tapestry of infrastructure, including bus systems, an airport, dormitories, classrooms, administrative buildings, and more, in order to carry out the work and discipline of the University, including its educational and research missions.

The University is closely integrated into the surrounding urban community, and is the City of Columbus's largest employer. The City of Columbus, in turn, is the capital and largest city in the State of Ohio. It is the 14th largest city in the country, and the second largest city in the Midwest, after Chicago. Approximately 45% of the U.S. population lives within a ten-hour drive of Columbus.

The Ohio Revised Code charges the University, its Board of Trustees, and designated administrators with responsibility to, in relevant part:

> regulate the use of the grounds, buildings, equipment, and facilities of such college or university and the conduct of the students, staff, faculty, and visitors to the campus *so that law and order are maintained and the college or university may pursue its educational objectives and programs in an orderly manner.*

R.C. 3345.21 (emphasis added). Further, the Ohio Revised Code charges the University, through its Board, to supervise "all lands, buildings, and other property belonging to the university, and the control of all expenses therefor[.]" R.C. 3335.10.

2

Consistent with its statutory mandate, the University has promulgated University Space Rules that seek to ensure "the continued safe and effective operation of the University." Ex. A hereto (University Space Rules, incorporated by reference as if fully set forth herein).  The University's policies and procedures with respect to the use of University space are viewpoint neutral.  Under the University Space Rules:

- "Use of University space is reserved for the direct and indirect support of the University's teaching, research, and service missions, the University's administrative functions, and students' campus-life activities."

- "The University may limit access to or use of its space as may be necessary to provide for the orderly conduct of the University's teaching, research, and service missions, the University's administrative functions, and students' campus-life activities."

- "Usage shall not disrupt the University's administrative functions or other campus activities, and may not impede ingress or egress to the University, any University property, parking lot, building, facility, or event."

- "Use of University property must not, in any form, disrupt University business."

Ex. A.

In accordance with University policies and procedures, only limited University spaces are made available for rent, subject to various rules and time, place, and manner restrictions. Other University spaces are never made available for rent.  For those limited buildings that have designated spaces available for rent, non-affiliated users of University space are expected to reimburse their own security costs incurred by the University, and/or provide appropriate proof of insurance, in addition to paying a facility rental fee.

### The First Amendment and Disruption of Schools and Campuses

The United States Supreme Court has long recognized the rights of governmental entities to ensure the orderly administration of day-to-day functions and duties of the institution, to

3

manage the property under their stewardship, and to develop policies and procedures in connection with expressive activity on that property.

> This Court has previously acknowledged that the "guarantees of the First Amendment have never meant 'that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.'" *Greer v. Spock*, 424 U.S., at 836, 96 S.Ct., at 1216, quoting *Adderley v. Florida*, 385 U.S., at 48, 87 S.Ct., at 247.

*U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 133 (1981). In its First Amendment jurisprudence, the U.S. Supreme Court has granted deference to government entities over the years to develop reasonable policies regarding expressive activities on the property they operate and manage, from declaring certain types of property to be closed to outside speakers (*see, e.g., Greer v. Spock*, 424 U.S. 828, 839 (1976), affirming right to ban partisan political campaigning from military bases, and *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 813–14 (1984) (affirming government's right to ban advertisements on public utility installations)), to limiting the categories of speech that may occur on certain property (*see, e.g., Lehman v. City of Shaker Heights*, 418 U.S. 298, 303-04 (1974) (affirming City's right to ban political advertising on City busses)), to developing viewpoint neutral policies and procedures that restrict the class of people who can use government property for expressive activity (*see, e.g., Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 52 (1983) (affirming school's ability to limit use of internal mail system to incumbent union communications, while banning rival union communications)).

With respect to schools and universities, First Amendment jurisprudence is robust in its special focus on and respect for the essential educational mission of such institutions, with careful consideration to the threats disruptive expressive activities pose to the educational mission. "First Amendment rights must be analyzed in light of the special characteristics of the

school environment." *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 664 (2010) (quoting *Widmar v. Vincent*, 454 U.S. 263, 268, n.5 (1981)). The U.S. Supreme Court:

> has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools.

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969). For example, the Court has affirmed the right of municipalities to ban "[n]oisy demonstrations that disrupt or are incompatible with normal school activities," even if the demonstrators would otherwise have a First Amendment right or interest in engaging in such activities. *Grayned v. City of Rockford*, 408 U.S. 104, 120 (1972). Balancing the interests in First Amendment expression with the need to ensure the orderly operation of schools, the Court in *Tinker* explained that a school may limit expressive activity that "would materially and substantially disrupt the work and discipline of the school." *Tinker*, 393 U.S. at 513.

The U.S. Supreme Court has expressly stated that the same material and substantial disruption standard applies on university campuses:

> In the context of the 'special characteristics of the school environment,' the power of the government to prohibit 'lawless action' is not limited to acts of a criminal nature. Also prohibitable are actions which 'materially and substantially disrupt the work and discipline of the school.' *Tinker v. Des Moines Independent Community School District*, 393 U.S., at 513, 89 S.Ct., at 740. Associational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education.

*Healy v. James*, 408 U.S. 169, 189 (1972). In the Court's own words:

> …we affirm the continuing validity of cases, *e. g.*, *Healy v. James*, 408 U.S., at 188–189, 92 S.Ct., at 2349–2350, that recognize a University's right to exclude even First Amendment activities that violate reasonable campus rules or substantially interfere with the opportunity of other students to obtain an education.

*Widmar*, 454 U.S. at 276–77.  The Sixth Circuit, like the U.S. Supreme Court, has expressly extended the *Tinker* disruption analysis to college campuses.  *See, e.g., Salehpour v. Univ. of Tennessee*, 159 F.3d 199, 208 (6th Cir. 1998) (no First Amendment right to disrupt classes).  *See also Krause v. Rhodes*, 570 F.2d 563, 571 (6th Cir. 1977) (violence at Kent State University justified university's actions banning demonstrations).

Consistent with the U.S. Supreme Court's direction in *Tinker*, the Sixth Circuit Court of Appeals has specifically held that a "reasonableness" standard applies: the school or university must have a reasonable belief, rooted in evidence, that the proposed expressive activity would materially and substantially disrupt the work and discipline of the school or university before they may act to disallow it.  A mere abstract fear of disruption is not enough—the concern must be rooted in evidence.  But the school or university is not required to wait for violence or disruption to emerge before acting.  *See Barr v. Lafon*, 538 F.3d 554, 565 (6th Cir. 2008).

Under the disruption rubric of *Tinker*, the courts have considered both evidence of potential or actual violence, as well as disruption that does not rise to the level of violence, in assessing whether the educational institution's limitations were reasonable.  For example, in *Grayned*, the Court noted that even expressive activity "that is neither violent nor physically obstructive" could be banned in the vicinity of a school, because "schools could hardly tolerate boisterous demonstrators who drown out classroom conversation, make studying impossible, block entrances, or incite children to leave the schoolhouse."  *Grayned*, at 408 U.S. at 119. Thus, "noisy demonstrators that disrupt or are incompatible with normal school activities" may be prohibited.  *Id.* at 120.

The Sixth Circuit, for its part, has routinely evaluated the presence or absence of a history of violence as one of the factors in determining whether the *Tinker* disruption standard is met.

6

*See, e.g., Castorina ex rel. Rewt v. Madison County Sch. Bd.*, 246 F.3d 536, 543-44 (6th Cir. 2001) (presence or absence of a history of racially motivated violence a factor in evaluating whether school has a reasonable belief that disruption would occur); *Barr*, 538 F.3d at 566 (noting that "[t]here is no requirement that disruption under *Tinker* be violent," and citing evidence of racist graffiti and "demeaning racial slurs" at school in evaluating whether disruption was reasonably forecast); *D.B. ex rel. Brogdon v. Lafon*, 217 F. App'x 518, 525 (6th Cir. 2007) (considering history of "racial tension, intimidation and violence to such an extent that law enforcement officials were brought in to maintain order" in concluding that disruption was reasonably forecast to occur); *Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 335-36 (6th Cir. 2010) (citing history of "racial violence, tension, and threats" in concluding that school disruption was reasonably forecast to occur); *Guzick v. Drebus*, 431 F.2d 594, 598 (6th Cir. 1970) (school reasonably forecast disruption under *Tinker* in light of past school fights); *Melton v. Young*, 465 F.2d 1332, 1335 (6th Cir. 1972) (history of "tense racial situation" and prior school closure meant that school reasonably forecast disruption under *Tinker*); *Norton v. Discipline Comm. Of E. Tennessee State Univ.*, 419 F.2d 195, 199 (6th Cir. 1969) (college does not have to "delay action against the inciters" until after a riot has occurred).[1]

---

[1]     *See also A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 223-24 (5th Cir. 2009) (noting that *Tinker* does not require a "full-fledged brawl" before a school can act, and noting history of past racial incidents, such as racist graffiti and prior physical confrontations); *Johnson v. Perry*, 859 F. 3d 156, 173 (2d Cir. 2017) ("No mandate in our Constitution leaves state instrumentalities powerless to protect the public from the kind of boisterous and threatening conduct that disturbs the tranquility of buildings that require peace and quiet to carry out their functions, such as courts, libraries, schools, and hospitals," and thus school administrators have the authority and responsibility  to ensure third parties "conduct themselves appropriately while on school property and that they do not engage in disruptive or threatening conduct that disturbs the tranquility of schools."); *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 253 (3d Cir. 2002) (holding "if a school can point to a well-founded expectation of disruption—especially one based on past incidents arising out of similar speech—the restriction may pass constitutional muster."); *Evans v. State Bd. of Agric.*, 325 F. Supp. 1353, 1359-61 (D. Colo. 1971) (university reasonably

Threats of violence or threats to public safety can certainly be one component of a disruption analysis under *Tinker*, *see, e.g., supra* fn. 1, but such prospective violence or public safety concerns are not the only kinds of disruption with constitutional significance in the educational setting, *see generally Grayned*, at 408 U.S. at 119 (potential noise, ingress/egress issues, and prospect of students leaving class all justified limitations on expressive activities near school buildings). First Amendment jurisprudence is such that a university does not have to permit expressive activity where the University has a reasonable belief, rooted in evidence, that the expressive activity would materially and substantially disrupt the work and discipline of the university, such as by interrupting classes, or substantially interfering with the opportunity of other students to obtain an education.

Separate and apart from the educational disruption analysis mandated by *Tinker* and its progeny, the prospect of violence or threats to public safety also allows the proscription of expressive activities outside the school or university setting, as well. *See generally Milk Wagon Drivers Union of Chicago, Local 743 v. Meadowmoor Dairies*, 312 U.S. 287, 294-95 (1941) (government can bar even peaceful picketing where the picketing activities "are enmeshed with contemporaneously violent conduct"); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 774 (1994) (noting that "fighting words," "threats," or speech "so infused with violence as to be indistinguishable from a threat of physical harm" are "independently proscribable" under the First Amendment); *Schenck v. Pro-Choice Network of W. New York*, 519 U.S. 357, 375 (1997)

---

forecast disruption given prior demonstration, and noting that in light of "extremely incendiary situation," that fact that "no one was seriously injured during that demonstration is almost unbelievable."); *Profita v. Puckett*, No. 15-CV-01237-DME-CBS, 2017 WL 1491003, at *24 and fn. 40 (D. Colo. Apr. 25, 2017) (plaintiff did not have First Amendment right to access or disrupt campus); *Koeppel v. Romano*, 252 F. Supp. 3d 1310, 1324-25 (M.D. Fla. 2017) (recognizing school's interest in proscribing conduct that affects students, safety, and ability to learn in safe and secure environment).

(noting government interest in "public safety and order" in First Amendment context); *Youngdahl v. Rainfair, Inc.*, 355 U.S. 131, 138-39 (1957) (noting that expressive conduct, depending on context, "may cease to be persuasion and become intimidation and incitement to violence" that government is entitled to proscribe); *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 180 (1968) ("We do not here challenge the principle that there are special, limited circumstances in which speech is so interlaced with burgeoning violence that it is not protected by the broad guarantee of the First Amendment."); *Virginia v. Black*, 538 U.S. 343, 360 (2003) ("Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or a group of persons with the intent of placing the victim in fear of bodily harm or death."); *Seattle Mideast Awareness Campaign v. King Cty.*, 781 F.3d 489, 501 (9th Cir. 2015) ("We agree with the district court that the threat of disruption here was real rather than speculative," including threat of "(1) vandalism, violence, or other acts endangering passengers and preventing the busses from running; (2) reduced ridership because of public fear of such endangerment; and (3) substantial resource diversion from the Metro's day-to-day operations.").  Public safety is an important part of the constitutional analysis in every setting, not just with respect to schools and universities.

**Cameron Padgett, Gregory "Ritter," and Richard Spencer**

Plaintiff, upon information and belief, is a Georgia State University student who wants to bring non-party Richard Spencer to the Ohio State campus for an event in University space. Neither plaintiff nor Mr. Spencer has any affiliation with Ohio State.

Plaintiff has been quoted in the press as stating he has never sought to bring Mr. Spencer to Georgia State, because plaintiff fears for his own safety if he were to propose such an event at his own university campus.  In an October 2017 *Miami Herald* article, Mr. Padgett is quoted as

9

stating "I don't want to get killed on campus" as the reason for not inviting Mr. Spencer to

Georgia State.  *See* Alex Harris, "*He's not a racist, he says, just an 'identitarian,' and he books*

*Richard Spencer's campus talks*," MIAMI HERALD, October 18, 2017,

http://www.miamiherald.com/news/local/education/article179559666.html (last visited

December 20, 2017).

Instead, plaintiff and his self-described "friend"—a person purporting to be named

Gregory Ritter, but who upon information and belief misrepresented his identity in his

application to use Ohio State space—have requested use of University space to host Mr. Spencer,

and claim to have a First Amendment interest in having the non-party speak at Ohio State.

Consistent with the University Space Rules, the University evaluated the requests in a

content-neutral and viewpoint neutral manner "to ensure that the usage does not disrupt the

University's mission, administrative functions, or other campus activities."  Ex. A at 1.

Plaintiff's proposed space rental was not permitted under University Space Rules and policies.

That is because of the substantial risk to public safety, as well as material and substantial

disruption to the work and discipline of the University, posed by plaintiff's proposed use of Ohio

State space.

The University's concerns in this respect are rooted in objective evidence coming from

recent events involving the same persons, including plaintiff, Mr. Spencer, and the purported Mr.

Ritter.  While plaintiff in his complaint cites several instances in which he claims Mr. Spencer

was able to speak on a college campus without violence and disruption, such as at Providence

College in 2011, the complaint is notably silent on facts arising from the two most salient recent

examples.

10

### 1.  Mr. Spencer's Conduct at the University of Virginia in August 2017, and Ensuing Violence in Charlottesville, Virginia

First, in August 2017, significant violence, unrest, and disruption occurred in Charlottesville, Virginia, in connection with a "Unite the Right" rally involving Mr. Spencer, including as an intended featured speaker.  Upon information and belief, although the "Unite the Right" rally was scheduled to occur on Saturday, August 12, 2017, in the City of Charlottesville, Mr. Spencer and his followers convened a surprise gathering on the campus of the University of Virginia on August 11, 2017.  According to public reports, when University of Virginia police and officials heard rumors of a Friday night rally on campus, they attempted repeatedly to speak to organizers, but were misdirected by those organizers as to where the campus activities would occur.  Without any advance warning or authorization, Mr. Spencer led hundreds of torch-wielding demonstrators in and around the university campus under cover of darkness, before encircling a group of university students and employees who were at or near a campus statue.  According to published accounts of first hand witnesses, Mr. Spencer and his supporters shouted invectives at the students and others gathered around the statute, threatened and intimidated them with the flaming torches, engaged in some altercations, injured a Dean of Students who was attempting to pull students out of harm's way, and allegedly struck a University of Virginia librarian in the neck with a tiki torch, resulting in the librarian suffering a stroke episode in the aftermath.  Professor Larry Sabato, who lived on campus and actively sheltered students in his basement during the confrontation, reportedly wrote to the University of Virginia President that night to say: "In my 47 years of association with the University, this was the worst thing I have ever seen unfold on the Lawn and at the Rotunda.  Nothing else even comes close."

Supporters and organizers of Mr. Spencer's August 11, 2017 march reportedly referred to it as a "military operation," and deployed drones to surveil the campus.  Later that night, Mr.

Spencer engaged in an extended monologue on YouTube, in which he declared the event a successful "occupation" of the university's space, characterized the campus community members present as "the enemy," and derided their calls for medics to tend to those injured. Upon information and belief, the use of torches by Mr. Spencer and his supporters was both a violation of Virginia criminal statutes, as well as University of Virginia space use rules.

In the day that followed, as the main "Unite the Right" rally continued, the Governor of the Commonwealth of Virginia declared a state of emergency due to civil unrest leading up to, resulting from, and subsequent to the Unite the Right rally and counterprotests in the City of Charlottesville, including in and around the University of Virginia campus. Despite expenditures of tens of thousands of public dollars on safety planning, the deployment of large numbers of state troopers, as well as the Virginia National Guard for support, the community was afflicted by unrest, violence, and intimidation. Upon information and belief, supporters of Mr. Spencer engaged in multiple violent altercations, including the alleged murder of a counterprotestor who was killed when a Unite the Right supporter drove his vehicle into the crowd, also injuring 19 others in the process; felonious assault in connection with a group attack on a lone counterprotestor in a parking garage; firing a gun in a crowd; and macing counterprotestors. Mr. Spencer was scheduled as a keynote speaker that day, and Mr. Spencer reportedly clashed with Virginia State Police attempting to control the violence emanating from the rally.

Upon information and belief, all elective surgeries had to be cancelled at the University of Virginia medical center to make way for anticipated trauma casualties, which materialized on August 12, 2017; surrounding businesses had to close due to their safety concerns; and community members were confronted with Unite the Right supporters carrying flaming torches, sticks, shields, guns, pistols, rifles, and clubs moving through their neighborhood. Upon

information and belief, the Unite the Right participants including Mr. Spencer reneged on prior safety plans that had been established with local officials, thereby escalating the potential and actual violence.  Mr. Spencer reportedly declared the event a success in the aftermath of the events of August 11 and 12, 2017.

Upon information and belief, as of December 18, 2017, various supporters of Mr. Spencer and/or the Unite the Right event have been criminally indicted, including for first degree murder with respect to the car attack, as well as malicious wounding and discharging a weapon within 1000 feet of a school with respect to other defendants, in connection with the Virginia events of August 12, 2017.

## 2.  Mr. Spencer's Appearance At The University Of Florida

Second, plaintiff and Mr. Spencer conducted an event at the University of Florida on October 19, 2017.  Upon information and belief, in order to accommodate that event while attempting to preserve public safety in light of the recent violence in Charlottesville, Virginia, the University of Florida, government leaders, and local law enforcement officials:

- Declared a state of emergency (by the Governor's office);

- Closed roads in and around campus;

- Brought more than 800 armed law enforcement to campus;

- Readied hundreds of National Guard members on standby;

- Closed multiple buildings and cancelled classes in the vicinity of the event;

- Closed the Counseling and Wellness Center, Southwest Recreation Center, and pools;

- Closed or altered bus routes;

- Placed residence halls on "swipe access only" for the week;

13

- Cancelled campus tours;

- Banned everything from pets, to water bottles, to umbrellas, to athletic equipment in broad swaths of campus; and

- Spent more than $500,000 to enhance security in the vicinity.

Upon information and belief, while not all classes on the University of Florida campus were *officially* closed or cancelled to accommodate the event, the mass operational disruptions implemented to accommodate the event had the collateral effect of causing a *de facto* closing of campus.  Both plaintiff and Mr. Spencer were speakers at the Florida event.

Despite the extraordinary efforts by the University of Florida and other Florida leaders, upon information and belief, supporters of plaintiff and Mr. Spencer nonetheless engaged in significant acts of intimidation and attempted violence on the day of the campus event.  In particular, three Spencer supporters who were interviewed by the press at the entrance to the event, thereby evincing their views and support, were arrested the same day after the event concluded.  Reportedly, the men yelled "Hail Hitler" chants at individuals near the campus, threatened "I'm going to f****** kill you," to those individuals, and fired a gunshot at them before fleeing the scene.  The men were arrested on attempted murder charges the evening of the Florida event.  According to the public record, those three Spencer supporters were held in custody with bail amounts ranging from $1 million to $3 million on the attempted murder charges, with two of the three remaining in jail currently on charges of attempted murder, felony possession of a firearm, and accessory to attempted first degree murder, and the third extradited to Texas on other criminal charges.  According to published reports, some or all of the three charged men had attended past Richard Spencer speeches at or near other college campuses, such as Texas A & M and the August 2017 events in Charlottesville, Virginia, and at least one of the

14

three was reportedly wearing the "uniform" of Mr. Spencer's and his supporters' private security detail.

Upon information and belief, based on information that emerged after the Florida event, Mr. Spencer, Mr. Ritter, and other event organizers and participants only feigned cooperation with local officials on safety matters, while drawing up secret military-style plans to disobey law enforcement or campus directives if their event was limited in ways that they deemed unacceptable. In addition to those military style plans, allegedly dubbed "Operation Gator" by Mr. Spencer's supporters, organizers and supporters of the event also had encouraged fellow supporters via social media to go out into the community surrounding the campus, and engage in so-called "flash demo" activities involving community confrontations. Upon information and belief, the actions of the three arrested men were consistent in whole or in part with the secret pre-event directives of the event's organizers.

Upon information and belief, Mr. Spencer and his supporters used the Florida event as a fundraising opportunity, with Mr. Spencer announcing afterwards that his actual speech did not matter so much as the event or spectacle itself (consistent with the "Operation Gator" plan document, which called "making a splash in the U.S. and international news" a key mission). Upon information and belief, Mr. Spencer, by and through plaintiff's counsel, threatened to return to the University of Florida for a repeat event, thereby raising the prospect of disruption, expense, and threats to public safety occurring all over again.

**The Day after the University of Florida Event, Ohio State Announced its Decision**

In the aftermath of the violent and disruptive events in Virginia and Florida, Ohio State, in consultation with its law enforcement professionals, looked at the question of whether the University could provide space to plaintiff for the requested event safely and without substantial

15

disruption to University operations. The University determined that such an event could not be accommodated at Ohio State at this time without substantial risk to public safety and material and substantial disruption to the work and discipline of the University.

Nor was Ohio State the only public institution to reach such a conclusion. Shortly after Ohio State's decision of October 20, 2017, the federal government, by and through the property manager for the General Services Administration's government-owned Ronald Reagan Building and International Trade Center, in Washington, D.C., announced that it would not agree to rent conference space for a requested Richard Spencer event.[2] In announcing the decision, the building's representatives stated publicly: "We concluded that extraordinary and costly measures would need to be taken to protect against the significant risk of violence and injuries posed to our clients, event attendees, tenants, employees and the general public, as well as damage to the property[.]" Perry Stein, "*Federal Building in D.C. rejects Richard Spencer's request to host conference*," THE WASHINGTON POST, November 2, 2017, https://www.washingtonpost.com/local/federal-building-in-dc-rejects-richard-spencers-request-to-host-conference/2017/11/02/a64b27ca-bfdc-11e7-959c-fe2b598d8c00_story.html (last visited December 20, 2017).

The University's decision complied with its Constitutional and statutory obligations, as well as those reflected in its preexisting, viewpoint neutral policies and procedures regarding the use of University space. The Constitution does not require Ohio State to accommodate plaintiff's space request in light of the facts presented, and does not require the University, as an

---

[2] According to the General Services Administration, the Ronald Reagan Federal Building and International Trade Center is the second largest government building in the country, with 3.1 million square feet of office space on an 11-acre site. *See* https://www.gsa.giv/real-estate/gsa-properties/visiting-public-buildings/ronald-reagan-building-and-international-trade-center (last visited December 20, 2017).

instrumentality of the State, to financially subsidize plaintiff's proposed event, to treat plaintiff better than other persons requesting to use University space (including but not limited to as it relates to security costs and insurance), or to defray the security and insurance costs associated with safety concerns emanating in whole or in part from the conduct of plaintiff and Mr. Spencer's own supporters. The notion that non-affiliate plaintiff's alleged First Amendment interest in bringing non-affiliate Mr. Spencer to Ohio State's campus, in light of the history of violence and disruption engendered by their past events, trumps the rights of the Ohio State 100,000 students and employees (including but not limited to their own rights to obtain an education and associate as they choose, without campus closures, cancelled classes, or unreasonable security restraints), and countless surrounding members of the Columbus community, is constitutionally infirm. It should be rejected on the facts presented. Defendants' rights and responsibilities with respect to the protection of constituents from violence and disruption, the orderly administration of an educational institution, the establishment of consistent, viewpoint neutral policies and procedures for the use by outsiders of University space, and stewardship of public resources, should be upheld.

## **FIRST DEFENSE**

1.      For their answer to paragraph 1 of the complaint, defendants deny that plaintiff has stated any claim under 42 U.S.C. § 1983 against defendants, deny any violation of plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution, admit the University denied a request by plaintiff to utilize University space to host Richard Spencer of the National Policy Institute ("NPI") as a speaker due to substantial risk to public safety and material and substantial disruption to the work and discipline of the University, and deny any remaining allegations contained in paragraph 1.

17

2.      For their answer to paragraph 2 of the complaint, defendants state they lack knowledge or information sufficient to form a belief as to the truth of the matters asserted in paragraph 2, and therefore deny the same.

3.      For their answer to paragraph 3 of the complaint, defendants admit President Drake is an adult natural person and the President of the University; state that President Drake at all times relevant acted properly, appropriately, and in the scope of his duties as President; specifically deny that President Drake has engaged in any 42 U.S.C. § 1983 violation with respect to plaintiff in any capacity and/or that the complaint states such a claim; and, answering further, state the remaining allegations state legal conclusions to which no responsive pleading is required.  To the extent a responsive pleading is required, defendants state they lack knowledge or information sufficient to form a belief as to the truth of the remaining matters asserted in paragraph 3, owing to the vagueness with which they were drafted, and therefore defendants deny the remaining allegations contained in paragraph 3 on that basis.

4.      For their answer to paragraph 4 of the complaint, defendants admit Ms. Rule is an adult natural person; state Ms. Rule is a reservations specialist with respect to Ohio Union Events who acted at all relevant times within the scope of her duties; specifically deny that Ms. Rule has engaged in any 42 U.S.C. § 1983 violation with respect to plaintiff in any capacity and/or that the complaint states such a claim; and answering further, state the remaining allegations in paragraph 4 contain legal conclusions to which no responsive pleading is required.  To the extent a responsive pleading is required, defendants state they lack knowledge or information sufficient to form a belief as to the truth of the remaining matters asserted in paragraph 4, owing to the vagueness with which they were drafted, and therefore defendants deny the remaining allegations contained in paragraph 4 on that basis.

18

5.      For their answer to paragraph 5, defendants state the allegations of paragraph 5 contain legal conclusions to which no responsive pleading is required.  To the extent a responsive pleading is required, defendants deny this Court has subject matter jurisdiction due to, *inter alia*, plaintiff's lack of standing and principles of immunity, and therefore deny the remaining allegations contained in paragraph 5.

6.      For their answer to paragraph 6 of the complaint, defendants state the allegations of paragraph 6 state legal conclusions to which no responsive pleading is required.  To the extent a responsive pleading is required, defendants specifically deny causing any tortious injury to plaintiff, and therefore deny the remaining allegations contained in paragraph 6.

7.      For their answer to paragraph 7 of the complaint, defendants state the allegations of paragraph 7 state legal conclusions to which no responsive pleading is required.  To the extent a responsive pleading is required, defendants deny the existence of any actionable events or omissions giving rise to plaintiff's putative claims, and answering further, admit venue is proper in this Court.

8.      For their answer to paragraph 8 of the complaint, defendants state that upon information and belief, plaintiff has been arrested for disrupting a high school event and failure to obey a police officer at such event; forgery; and drug-related offenses; state that plaintiff has been a participant in events enmeshed in threatened and/or actual violence; and, answering further, state they lack knowledge or information sufficient to form a belief as to the truth of the remaining matters asserted in paragraph 8, and therefore deny the same.

9.      For their answer to paragraph 9 of the complaint, defendants state they lack knowledge or information sufficient to form a belief as to the truth of the matters asserted in paragraph 9, and therefore deny the same.

10. For their answer to paragraph 10 of the complaint, defendants admit plaintiff is a supporter of Mr. Spencer; admit plaintiff has been involved in other episodes involving Mr. Spencer and college campuses; and answering further, state they lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 10, and therefore deny the same.

11. For their answer to paragraph 11 of the complaint, defendants state they lack knowledge or information sufficient to form a belief as to the truth of the matters asserted in paragraph 11, and therefore deny the same.

12. For their answer to paragraph 12 of the complaint, defendants deny the first sentence of paragraph 12; state they lack knowledge or information sufficient to form a belief as to the truth of the matters asserted in the second sentence of paragraph 12, and therefore deny the same; and deny the third sentence of paragraph 12, insofar as upon information and belief, as reported in the public record, in interviews, and in other public statements, Mr. Spencer's events have been enmeshed in violence, which has led to criminal conduct on the part of Mr. Spencer's supporters at recent events, and Mr. Spencer has advocated criminal conduct, including as it relates to events at the University of Virginia campus on August 11, 2017.

13. For their answer to paragraph 13 of the complaint, defendants state that upon information and belief, NPI is a for-profit corporation engaged in commercial activity in which Mr. Spencer has a pecuniary interest; answering further, defendants state they lack knowledge or information sufficient to form a belief as to the first two sentences of paragraph 13, and therefore deny the same; and answering further, defendants deny the allegations contained in the third sentence of paragraph 13.

14.     For their answer to paragraph 14 of the complaint, defendants state that upon information and belief, based on information publicly reported and in the public record, the most significant episodes of violence at prior events involving plaintiff, Mr. Spencer, and/or NPI have involved supporters of plaintiff, Mr. Spencer, and/or NPI engaging in violent attacks, including, but not limited to, the homicide and/or attempted homicide of bystanders and counterprotestors; and, answering further, defendants state they lack knowledge or information sufficient to form a belief as to the truth of the remaining matters asserted in paragraph 14, and therefore deny the same.

15.     For their answer to paragraph 15 of the complaint, defendants state they lack knowledge or information sufficient to form a belief as to the truth of the matters asserted in paragraph 15, and therefore deny the same.

16.     For their answer to paragraph 16 of the complaint, defendants state the University is a public educational institution, organized under the laws of the State of Ohio including R.C. §§ 3335.01, *et seq.*, with a main campus located principally in the City of Columbus, Franklin County, State of Ohio, and deny any remaining allegations contained in paragraph 16.

17.     For their answer to paragraph 17 of the complaint, defendants admit that President Drake is the President of the University and has duties commensurate with such position, but answering further, state they lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 17, owing to the vagueness with which they were drafted, and therefore deny the same.

18.     For their answer to paragraph 18 of the complaint, defendants state the referenced website speaks for itself, and deny any allegations in paragraph 18 inconsistent with its terms; and, answering further, defendants state that the University makes certain spaces available for

rent in limited times and manners, subject to, *inter alia*, the terms and conditions of the

University's Space Use Rules and policies, which provide, *inter alia*:

- "Use of University space is reserved for the direct and indirect support of the University's teaching, research, and service missions, the University's administrative functions, and students' campus-life activities."

- "The University may limit access to or use of its space as may be necessary to provide for the orderly conduct of the University's teaching, research, and service missions, the University's administrative functions, and students' campus-life activities."

- "Usage shall not disrupt the University's administrative functions or other campus activities, and may not impede ingress or egress to the University, any University property, parking lot, building, facility, or event."

- "Use of University property must not, in any form, disrupt University business."

Ex. A.  Answering further, defendants deny each and every remaining allegation in paragraph 18

inconsistent with the above.

      19.     For their answer to paragraph 19 of the complaint, defendants state that on July

28, 2017, a person using the name Gregory Ritter, National Policy Institute, submitted an "RFP

form" online for a program named "Richard Spencer College Tour," listing several preferred

venues at the University, in which form it was represented "Due to the nature of the event, we

will need a lot of security;" answering further, defendants state they lack knowledge or

information sufficient to form a belief as to the truth the remaining allegations contained in

paragraph 19, and therefore deny the same.

      20.     For their answer to paragraph 20 of the complaint, defendants state the September

1, 2017 email speaks for itself, and deny any remaining allegations in paragraph 20 inconsistent

with its contents.

      21.     For their answer to paragraph 21 of the complaint, defendants admit that someone

purporting to be Mr. Padgett called by phone in September 2017 to speak regarding renting

space, but further answering, state they lack knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 21, and therefore deny the same.

22. For their answer to paragraph 22 of the complaint, defendants state the referenced email speaks for itself; deny any allegations inconsistent with its contents; and state they lack knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 22, and therefore deny the same.

23. For their answer to paragraph 23 complaint, defendants state the referenced email purportedly from "Cameron Cory Padgett, Sr.," with an email address of cpadgett4@student.gsu.edu, to Diana Gerber, Coordinator of Planning and Scheduling, speaks for itself, and deny any allegations inconsistent with its contents; answering further, defendants state they lack knowledge or information sufficient to form a belief as to the truth of the remaining matters asserted in paragraph 23, and therefore deny the same.

24. Admit the allegations contained in paragraph 24.

25. For their answer to paragraph 25 of the complaint, defendants state the referenced email speaks for itself, and deny any allegations in paragraph 25 inconsistent with its contents; and, answering further, state they lack knowledge or information sufficient to form a belief as to the remaining allegations contained in paragraph 25, and therefore deny the same.

26. For their answer to paragraph 26 of the complaint, defendants state the referenced email speaks for itself, and deny any allegations in paragraph 26 inconsistent with its contents; and, answering further, state they lack knowledge or information sufficient to form a belief as to the remaining allegations contained in paragraph 26, and therefore deny the same.

27. For their answer to paragraph 27 of the complaint, defendants state the October 8, 2017 email from plaintiff's counsel to "sl-ohiounionevents@osu.edu" with a copy to various

media persons, Mr. Spencer, Mr. Padgett, and others speaks for itself, deny the email references

Mr. Padgett and "other invited speakers" other than Mr. Spencer, and deny any remaining

allegations in paragraph 27 inconsistent with the contents of the October 8, 2017 email.

28.     For their answer to paragraph 28 of the complaint, defendants admit Mr. Culley's

position as a Senior Vice President and General Counsel; state Mr. Culley's October 13, 2017

email speaks for itself and deny any allegations inconsistent with its contents; deny that the email

was sent on behalf of "defendants," as opposed to the University; and deny any remaining

allegations contained in paragraph 28 inconsistent with the above.

29.     For their answer to paragraph 29 of the complaint, defendants state the referenced

email speaks for itself, and deny any allegations in paragraph 29 inconsistent with it contents;

and answering further, state they lack knowledge or information sufficient to form a belief as to

the truth of the remaining matters asserted in paragraph 29, and therefore deny the same.

30.     For their answer to paragraph 30 of the complaint, defendants state the referenced

email speaks for itself, and deny any allegations in paragraph 30 inconsistent with its contents.

31.     For their answer to paragraph 31 of the complaint, defendants state a letter dated

October 20, 2017 was sent via email and ordinary U.S. mail from the University's counsel to Mr.

Padgett's counsel, Kyle Bristow, which letter speaks for itself; deny any allegations in paragraph

31 inconsistent with its contents, including its omitted parts; deny the letter was sent on behalf of

"defendants," as opposed to the University; and deny any remaining allegations contained in

paragraph 31 inconsistent with the above.

32.     For their answer to paragraph 32 of the complaint, defendants state a letter dated

October 20, 2017, was sent via email and ordinary U.S. mail from the University's counsel to

Mr. Padgett's counsel, which letter speaks for itself; deny any allegations in paragraph 32

inconsistent with its contents; deny that plaintiff's requests referred to anyone other than Mr.

Spencer as speaker; specifically deny that plaintiff has a right to use University facilities for an

event that poses a substantial risk to public safety, as well as material and substantial disruption

to the work and discipline of the University; deny that the University has a "publicly available

room" for such events or activities; and deny any remaining allegations contained in paragraph

32.

     33.    For their answer to paragraph 33 of the complaint, defendants state that the

violence and/or disruption on which the University's decision was based has been enmeshed in

the recent, significant, campus-related events associated with plaintiff and/or Mr. Spencer; state

that upon information and belief, according to publicly available reports and records, the most

significant violence to date has come from supporters of plaintiff and Mr. Spencer, and not any

alleged hecklers; state that the disruption engendered by, *inter alia*, the security necessitated by

plaintiff and/or Mr. Spencer's requested events threatens the University's work, discipline,

mission and business, including, but not limited to, the ability of students, staff, faculty members,

and community members to get to class, access University spaces, associate as they choose, and

go about their business in the ordinary course of University affairs; state that the University's

decision is based on objective facts about the actions and circumstances surrounding plaintiff

and/or Mr. Spencer's recent events, and not on the content of their speech; specifically deny any

allegation implicit or explicit in paragraph 33 that defendants have engaged in any constitutional

violation with respect to plaintiff, and/or that the cited case law provides otherwise; and,

answering further, deny any remaining allegations in paragraph 33 inconsistent with the above.

     34.    For their answer to paragraph 34 of the complaint, defendants state that the

University's history has included a number of speakers on a number of topics, in a variety of

contexts; admit the referenced persons have spoken on campus in a variety of contexts; deny knowledge or information sufficient to form a belief as to the truth of the complaint's characterization of the beliefs or affiliations of the referenced speakers; deny that the University has engaged in viewpoint discrimination or any constitutional violation with respect to plaintiff's request; deny any allegation implicit or explicit in paragraph 34 that the University or any of its constituents or affiliates have invited plaintiff or Mr. Spencer to the University; deny any allegation implicit or explicit in paragraph 34 that the University has a policy or practice of permitting non-affiliates to use University space where such use would create public safety concerns, and/or substantially and materially disrupt the work and discipline of the University; state the referenced case law speaks for itself and deny it requires the University to host the requested event; and deny any remaining allegations contained in paragraph 34.

35.     For their answer to paragraph 35 of the complaint, defendants state that recent events of Mr. Spencer and/or Mr. Padgett have, based on objective evidence, inflamed their supporters to acts of violence, and/or contributed to an atmosphere of violence, disruption, intimidation, and/or danger; deny that such events are constitutionally protected on university campuses in the manner alleged; and deny the remaining allegations contained in paragraph 35.

36.     For their answer to paragraph 36 of the complaint, defendants deny the allegations contained in paragraph 36.

37.     For their answer to paragraph 37 of the complaint, defendants specifically deny they have discriminated against plaintiff based on the content of his alleged philosophy, belief, or speech.  Answering further, defendants state that irrespective of any personal views on plaintiff's philosophy, beliefs, or speech, the decision to deny plaintiff access to University space for the proposed event was based upon a substantial risk to public safety, as well as material and

26

substantial disruption to the work and discipline of the University, and defendants therefore deny the remaining allegations contained in paragraph 37 on that basis.

38.     For their answer to paragraph 38 of the complaint, defendants deny the existence of a "publicly available room" in which they do or must allow events that pose a substantial risk to public safety, as well as material and substantial disruption to the work and discipline of the University, and deny that the violence and disruption that has occurred to date at other recent campus events involving plaintiff and/or Mr. Spencer has stemmed solely from "violence threatened by the left-wing adversaries of Plaintiff and Spencer," given that the most significant violence to date has stemmed from the actions of apparent supporters of plaintiff and Mr. Spencer.  Answering further, defendants state the remaining allegations contained in paragraph 38 contain legal conclusions to which no responsive pleading is required.  To the extent a responsive pleading is required, defendants specifically deny committing any First and/or Fourteenth Amendment constitutional violation as to plaintiff, and deny any remaining allegations contained in paragraph 38.

39.     For their answer to paragraph 39 of the complaint, defendants state they lack knowledge or information sufficient to form a belief as to the truth of the matters asserted in paragraph 39 regarding plaintiff, the nature of his affiliation with Mr. Spencer and/or NPI, or his intended course of conduct, and defendants therefore deny the allegations regarding the same. Answering further, defendants deny plaintiff was "unequivocally clear" about the capacity in which he was requesting space in his communications with Ms. Rule or otherwise; specifically deny any constitutional violation as to plaintiff; and deny any remaining allegations contained in paragraph 39.

40.     For their answer to paragraph 40 of the complaint, defendants deny the first sentence of paragraph 40, including, but not limited to, because of the fact that the event at Auburn University, upon information and belief, occurred prior to the events in Charlottesville, Virginia; the University of Virginia; and the University of Florida, in which a substantial risk to public safety, as well as material and substantial disruption to the work and discipline of the universities, was apparent based on objective evidence.  Answering further, defendants deny that Ex. A to the complaint represents controlling authority with respect to this Court; deny that the factual record is similarly situated in this case versus the prior litigation; deny that the terms of the prior Court order would represent an adequate safety plan based on current information; deny plaintiff has any entitlement to the same or comparable relief; and answering further, state they lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 40, and therefore deny the same.

41.     For their answer to paragraph 41 to the complaint, defendants state that upon information and belief, plaintiff and Mr. Spencer were involved in the University of Florida event in October 2017, but answering further, defendants state they lack knowledge or information sufficient to form a belief as to the truth of the remaining matters asserted in paragraph 41, and therefore deny the same.

42.     For their answer to paragraph 42 of the complaint, defendants state they lack knowledge or information sufficient to form a belief as to the truth of the matters asserted in paragraph 42, and therefore deny the same.

43.     For their answer to paragraph 43 of the complaint, defendants state they lack knowledge or information sufficient to form a belief as to the truth of the matters asserted in paragraph 43, and therefore deny the same.

44. For their answer to paragraph 44 of the complaint, defendants state they lack knowledge or information sufficient to form a belief as to the truth of the matters asserted in paragraph 44, and therefore deny the same.

45. For their answer to paragraph 45 of the complaint, defendants deny that the cited YouTube video adequately records the full extent of the public safety threat and disruption to the work and discipline of the university that occurred at the University of Florida event; deny any implicit or explicit allegation of a purported "heckler's veto" at the event; and answering further, state that with respect to the University of Florida, it is apparent that plaintiff and Mr. Spencer's appearance caused massive disruption to the work and discipline of the university, including the closing of certain campus buildings, a significant law enforcement presence on campus, cancellation of certain classes, declaration of a state of emergency by the Governor of Florida, restrictions on ordinary movements around campus, restrictions on ordinary items that can be carried in campus, and a general atmosphere of fear, tension, and/or intimidation, compounded by events in the near aftermath of the speech and in the near vicinity, in which alleged supporters of plaintiff and/or Mr. Spencer engaged in an armed confrontation with community members, and ultimately were charged with attempted murder after firing a gun at persons at whom they had been shouting slurs. Answering further, defendants deny any remaining allegations contained in paragraph 45.

46. For their answer to paragraph 46 of the complaint, defendants state they lack knowledge or information sufficient to form a belief as to the truth of the matters asserted in paragraph 46, and therefore deny the same.

47.     For their answer to paragraph 47 of the complaint, defendants state they lack knowledge or information sufficient to form a belief as to the truth of the matters asserted in paragraph 47, and therefore deny the same.

48.     For their answer to paragraph 48 of the complaint, defendants state they lack knowledge or information sufficient to form a belief as to the truth of the matters asserted in paragraph 48, and therefore deny the same.

49.     For their answer to paragraph 49 of the complaint, defendants state they lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding plaintiff's mindset, and therefore deny the same; answering further, defendants deny any allegation implicit or explicit in paragraph 49 that the University has instituted a permanent ban on plaintiff's space use requests at this time; and answering further, defendants state that plaintiff's recent requests have been denied due to concerns for safety, and substantial and material disruption to the work and discipline of the University, in light of evidence reflected in the recent campus events involving plaintiff and/or Mr. Spencer at or near the University of Virginia and the University of Florida.  Answering further, defendants deny any remaining allegations in paragraph 49 inconsistent with the above.

50.     For their answer to paragraph 50 of the complaint, defendants specifically deny the allegations contained in paragraph 50.

51.     For their answer to paragraph 51 of the complaint, defendants state that paragraph 51 contains legal conclusions to which no responsive pleading is required; to the extent a responsive pleading is required, defendants deny that plaintiff has standing and/or states a claim with respect to the matters alleged; deny the existence of any tortious conduct towards plaintiff; deny the allegation that qualified immunity does not apply with respect to the claims asserted

against defendants in their individual capacities; deny that there is any clearly established constitutional right to use University space that is subject to University Space Rules and policies for purposes that present a substantial risk to public safety, as well as material and substantial disruption to the work and discipline of the University; deny that the cases cited in paragraph 51, which speak for themselves, provide otherwise; and deny any remaining allegations contained in paragraph 51.

52.      For their answer to paragraph 52, defendants state paragraph 52 contains legal conclusions to which no responsive pleading is required; to the extent a responsive pleading is required, defendants state the cited case speaks for itself, and deny any allegations in paragraph 52 contrary to its contents; answering further, defendants state that plaintiff's purported requested "injunctive" relief is really, upon information and belief, a request for money damages that implicates defendants' qualified immunity and principles of sovereign immunity with respect to plaintiff's demand that defendants expend state funds on his behalf; and, answering further, defendants deny any remaining allegation contained in paragraph 52, including, but not limited to, any allegation implicit or explicit in paragraph 52 that plaintiff is entitled to such relief.

53.      For their answer to paragraph 53 of the complaint, defendants state paragraph 53 contains legal conclusions to which no responsive pleading is required; to the extent a responsive pleading is required, defendants specifically deny the existence of any criminal conduct by defendants; deny that plaintiff is entitled by and through counsel to threaten criminal charges in order to attempt to gain advantage in a civil case; and deny any remaining allegations in paragraph 53 regarding the alleged nature of their conduct.

54.     For their answer to paragraph 54 of the complaint, defendants state paragraph 54 contains legal conclusions to which no responsive pleading is required; to the extent a responsive pleading is required, defendants specifically deny the existence of any criminal conduct by defendants; deny that plaintiff is entitled by and through counsel to threaten criminal charges in order to attempt to gain advantage in a civil case; and deny any remaining allegations in paragraph 54 regarding the alleged nature of their conduct.

55.     For their answer to paragraph 55 of the complaint, defendants incorporate by reference, as if fully set forth herein, paragraphs 1 through 54, above, of this answer, together with their prefatory statement.

56.     For their answer to paragraph 56 of the complaint, defendants state that paragraph 56 contains legal conclusions to which no responsive pleading is required.  To the extent a responsive pleading is required, defendants deny a constitutional right on the part of plaintiff to use University space in contravention of University Space Rules and policies for purposes that present a substantial risk to public safety, as well as material and substantial disruption to the work and discipline of the University.  Answering further, defendants deny that plaintiff has a constitutional right to have the University and/or the State of Ohio financially subsidize the security costs associated with plaintiff's proposed event, including but not limited to the security costs associated with addressing potential violence and disruption from plaintiff's own supporters, when other non-affiliated users of University space are expected to pay security costs.  Answering further, defendants deny any remaining allegations contained in paragraph 56.

57.      For their answer to paragraph 57 of the complaint, defendants deny the existence of a "publicly available room" in which they do allow or must allow events that pose a substantial risk to public safety, as well as material and substantial disruption to the work and

discipline of the University; deny the existence of a request by plaintiff to host "speakers—including Plaintiff;" and deny the remaining allegations contained in paragraph 57.

58.     For their answer to paragraph 58 of the complaint, defendants deny the existence of a "publicly available room" in which they do or must allow events that pose a substantial risk to public safety, as well as material and substantial disruption to the work and discipline of the University; deny the existence of a request by plaintiff to host "speakers—including Plaintiff;" deny they have engaged in unconstitutional viewpoint discrimination with respect to plaintiff; and deny the remaining allegations contained in paragraph 58.

59.     For their answer to paragraph 59 of the complaint, defendants deny the existence of a "publicly available room" in which they do allow or must allow events that pose a substantial risk to public safety, as well as material and substantial disruption to the work and discipline of the University; deny any allegation implicit or explicit in paragraph 59 that the University's decision was due solely to "the threat of violence that Antifa leftists pose," and deny any allegation implicit or explicit in paragraph 59 that the University's decision was due solely to concerns of violence from alleged "hecklers."  Answering further, defendants state the University's decision to not permit the rental of University space for the purposes proposed by plaintiff was rooted in a substantial risk to public safety, as well as material and substantial disruption to the work and discipline of the University, as reflected in other recent events associated with plaintiff and/or Mr. Spencer which have evidenced such risks.  Answering further, defendants deny the existence of a request by plaintiff to host "speakers—including Plaintiff," and defendants deny any remaining allegations in paragraph 59 inconsistent with the above, including the applicability of the cited case to the specific facts presented.

60. For their answer to paragraph 60 of the complaint, defendants deny the existence of a "publicly available room" in which they do or must allow events that pose a substantial risk to public safety, as well as material and substantial disruption to the work and discipline of the University; deny the existence of a request by plaintiff to host "speakers—including Plaintiff;" deny that the threat of violence, harm to public safety, and University disruption associated with plaintiff' request is "uncertain and non-imminent;" and deny the remaining allegations contained in paragraph 60, including, but not limited to, the legal conclusions contained therein.

61. For their answer to paragraph 61 of the complaint, defendants state paragraph 61 contains legal conclusions to which no responsive pleading is required; to the extent a responsive pleading is required, defendants deny Ms. Rule made the alleged decision; state President Drake operated in the scope of his duties, lawfully, and appropriately, in reaching the decision; deny any allegation implicit or explicit in paragraph 61 that any defendant violated the law; deny the existence of a request by plaintiff to host "speakers—including Plaintiff;" and answering further, state they lack knowledge or information sufficient to form a belief as to the remaining allegations contained in paragraph 61 owing to the vagueness with which they were drafted, and therefore deny the same.

62. For their answer to paragraph 62 of the complaint, defendants deny the allegations contained in paragraph 62, including any and all allegations contained in the prayer for relief.

63. For their answer to paragraph 63 of the complaint, defendants incorporate by reference, as if fully set forth herein, paragraphs 1 through 62, above, of this answer, together with their prefatory statement.

64. For their answer to paragraph 64 of the complaint, defendants deny the existence of a "publicly available room" in which they do allow or must allow events that pose a

substantial risk to public safety, as well as material and substantial disruption to the work and discipline of the University; deny the existence of a request by plaintiff to host "speakers—including Plaintiff;" and deny the remaining allegations contained in paragraph 64.

65. For their answer to paragraph 65 of the complaint, defendants deny the existence of a "publicly available room" in which they do allow or must allow events that pose a substantial risk to public safety, as well as material and substantial disruption to the work and discipline of the University; deny the existence of a request by plaintiff to host "speakers—including Plaintiff;" and deny the remaining allegations contained in paragraph 65. Answering further, defendants deny that plaintiff has a constitutional right to have the University and/or the State of Ohio financially subsidize the security and insurance costs associated with plaintiff's proposed event, including but not limited to the costs associated with addressing potential violence and disruption from plaintiff's own supporters, when other non-affiliated users of University space are expected to pay security costs and/or provide proof of appropriate insurance.

66. For their answer to paragraph 66 of the complaint, defendants deny the allegations contained in paragraph 66.

67. For their answer to paragraph 67 of the complaint, defendants deny the allegations contained in paragraph 67.

68. For their answer to paragraph 68 of the complaint, defendants deny the existence of a "publicly available room" in which they do allow or must allow events that pose a substantial risk to public safety, as well as material and substantial disruption to the work and discipline of the University; deny the existence of a request by plaintiff to host "speakers—including Plaintiff;" and deny the remaining allegations contained in paragraph 68.

69.     For their answer to paragraph 69 of the complaint, defendants deny the existence of a "publicly available room" in which they do allow or must allow events that pose a substantial risk to public safety, as well as material and substantial disruption to the work and discipline of the University; deny the existence of a request by plaintiff to host "speakers— including Plaintiff;" and deny the remaining allegations contained in paragraph 69.

70.     Defendants deny each and every remaining allegation contained in the complaint, including but not limited to those contained in any and all prayer(s) for relief, not otherwise expressly admitted herein to be true.

## SECOND DEFENSE

71.     Plaintiff lacks standing with respect to the claims asserted.

## THIRD DEFENSE

72.     The complaint fails to state a claim upon which relief may be granted.

## FOURTH DEFENSE

73.     Plaintiff's claims in whole or in part are barred by sovereign immunity and the Eleventh Amendment.

## FIFTH DEFENSE

74.     Qualified immunity bars some or all of the claims and relief requested.

## SIXTH DEFENSE

75.     Plaintiff is not the real party in interest.

## SEVENTH DEFENSE

76.     Plaintiff failed to join an indispensable party or parties.

## EIGHTH DEFENSE

77.     Principles of waiver and/or estoppel bar some or all of the relief requested.

## NINTH DEFENSE

78.     Plaintiff's request for declaratory and/or injunctive relief is in practical and legal effect an improper request for money damages barred by sovereign immunity with respect to all official capacity defendants, and/or by qualified immunity with respect to individual capacity defendants.

## TENTH DEFENSE

79.     Plaintiff's requested relief whereby the University would be forced to expend  its funds to supply security and/or insurance for plaintiff's event, and in connection with the risk of violence and disruption associated in whole or in part with plaintiff's own supporters, raises impermissible and inequitable equal protection concerns with respect to other non-University affiliates who are and have been, consistent with University policy, expected to pay security costs and/or provide appropriate proof of insurance under University Space Rules and policies.

## ELEVENTH DEFENSE

80.     Plaintiff's request for punitive damages is improper, and/or is subject to Constitutional and/or statutory limitations.

## TWELFTH DEFENSE

81.     Plaintiff and/or his agents and/or affiliates committed acts of misrepresentation with respect to the request to use University space, and therefore plaintiff has unclean hands with respect to the requested relief.

## THIRTEENTH DEFENSE

82.     Some or all of the speech or conduct at issue is of a commercial nature, designed to further the financial interests of Mr. Spencer and/or the for-profit NPI.

## FOURTEENTH DEFENSE

83.    Plaintiff's admission of substantial security needs estops plaintiff from arguing that there is no significant risk to public safety and/or material and substantial disruption to the work and discipline of the University at stake with respect to the requested event.

## FIFTEENTH DEFENSE

84.    The University Space Rules and space rental policies place reasonable and appropriate time, place, and manner restrictions on the use of University space, and do not discriminate based on viewpoint.

## SIXTEENTH DEFENSE

85.    The University's status as an educational institution gives it the right and responsibility to reasonably assess whether proposed expressive activities would substantially and materially affect the work and discipline of the University, infringe reasonable campus rules, interrupt classes, and/or substantially interfere with the opportunity of students to obtain an education.  *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969); *Healy v. James*, 408 U.S. 169, 189 (1972); *Widmar v. Vincent*, 454 U.S. 263, 276–77 (1981).  Plaintiff's requested relief would substantially and materially affect the work and discipline of the University, infringe on reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of University students to obtain an education.

## SEVENTEENTH DEFENSE

86.    Threatening, harassing, and intimidating behavior impedes, if not destroys, the ability to teach and educate, and disrupts, if not destroys, the discipline necessary for an environment in which education can take place.  *See Bell v. Itawamba Cty. Sch. Bd.*, 799 F.3d

379, 399-400 (5th Cir. 2015), *cert. denied sub nom. Bell v. Itawamba Cty. Sch. Bd.*, 136 S. Ct. 1166, 194 L. Ed. 2d 240 (2016).

## EIGHTEENTH DEFENSE

87.     Noisy demonstrations that disrupt or are incompatible with normal school activities, next to a school, while classes are in session, may be prohibited.  *See Grayned v. City of Rockford*, 408 U.S. 104, 120 (1972).

## NINETEENTH DEFENSE

88.     Plaintiff's requested relief would impermissibly infringe on the freedom of speech and freedom of association rights of members of the University community, including, but not limited to, as a result of the infringements resulting from implementation of a security plan commensurate with the degree of risk presented.

## TWENTIETH DEFENSE

89.     The actual and proposed events sponsored by plaintiff and/or Mr. Spencer are enmeshed in actual and/or prospective violence and/or coercion.  *See, e.g., Youngdhalf v. Rainfair, Inc.*, 355 U.S. 131, 138-39 (1957); *Milk Wagon Drivers Union of Chicago, Local 753 v. Meadowmoor Dairies, Inc.*, 312 U.S. 287, 293 (1941) ("[U]tterance in a context of violence can lose its significance as an appeal to reason and become part of an instrument of force.  Such utterance was not meant to be sheltered by the Constitution….  And acts which in isolation are peaceful may be part of a coercive thrust when entangled with acts of violence."); *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 180 (1968) ("[T]here are special, limited circumstances in which speech is so interlaced with burgeoning violence that it is not protected by the broad guarantee of the First Amendment.").

## TWENTY-FIRST DEFENSE

90.     The Sixth Circuit Court of Appeals has rejected arguments that an Ohio public university allegedly has to wait for violence to emerge before acting to limit events with a history of disruption and violence.  *See Krause v. Rhodes*, 570 F.2d 563, 571 (6th Cir. 1977).

## TWENTY-SECOND DEFENSE

91.     Defendants reserve the right to add to, alter or otherwise amend the foregoing affirmative defenses as ongoing proceedings reveal to be appropriate.

WHEREFORE, having fully answered the complaint, defendants respectfully request the same be dismissed with prejudice, that they be awarded their fees and costs, and that they be awarded such other and additional relief as the Court deems just and equitable.

Respectfully submitted,


MICHAEL DeWINE
ATTORNEY GENERAL OF OHIO

By:     /s/ Michael H. Carpenter
        Michael H. Carpenter (0015733)
        Timothy R. Bricker (0061872)
        Katheryn M. Lloyd (0075610)
        Michael N. Beekhuizen (0065722)
        Caitlin E. Vetter (0090665)
        CARPENTER LIPPS AND LELAND LLP
        280 Plaza, Suite 1300
        280 North High Street
        Columbus, OH 43215
        E-mail:carpenter@carpenterlipps.com
                bricker@carpenterlipps.com
                lloyd@carpenterlipps.com
                beekhuizen@carpenterlipps.com
                vetter@carpenterlipps.com

        *Special Counsel for Defendants Michael V. Drake and Whitney Rule*

## <u>JURY DEMAND</u>

Defendants hereby demand a jury of the maximum number allowable by law on all issues so triable.

<u>/s/  Michael H. Carpenter</u>
Michael H. Carpenter (0015733)

*One of the Attorneys for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that the foregoing Defendants' Answer To Plaintiff Cameron Padgett's

First Amended Verified Complaint was uploaded to the Clerk's ECF system for filing, this 22nd

day of December, 2017, which will cause service upon:


Kyle Bristow, Esq.
P.O. Box 381164
Clinton Twp., MI 48038
E-mail: <u>BristowLaw@gmail.com</u>

*Attorney for Cameron Padgett*



/s/  Michael H. Carpenter
*One of the Attorneys for Defendants*